GOTTSCHALK CO. v. DISTILLING & CATTLE-FEEDING CO.

(Circuit Court, D. Illinois.     April 24, 1894.)

**1. SALE—AGREEMENT FOR REBATE—BREACH.**

Where defendant sold liquors to plaintiff for more than its market value, agreeing to return part of the excess to plaintiff at the end of the six months if it appeared that plaintiff had made purchases from no one else, the fact that one of plaintiff's agents, accidentally, without plaintiff's knowledge, and without intention to violate the understanding of the parties, made a purchase from another person, will not prevent recovery by plaintiff of such excess.

**2. SAME—FURNISHING PROOFS.**

Nor will plaintiff be prevented from recovering by reason of failure to furnish a form, as stipulated with defendant, showing all the sales made by plaintiff, and to whom made, where he furnishes all the data necessary to enable defendant to ascertain if plaintiff had sold any goods other than those he had purchased of defendant.

Action by the Gottschalk Company against the Distilling & Cattle-Feeding Company.     Judgment for plaintiff.

H. B. Stevens, for plaintiff.
Green & Robbins, for defendant.

GROSSCUP, District Judge (orally).     The action in this case is to recover from the Distilling & Cattle-Feeding Company something

over $35,000, said to be the money of the plaintiff, and unlawfully and wrongfully withheld from the plaintiff by the defendant. The testimony shows that the method of doing business of the defendant was something like this: It would appoint wholesale liquor dealers throughout the country as its ostensible agents. It would then sell to these supposed agents the products of the defendant at a price seven cents per proof gallon above the prevailing market price. This seven cents thus taken from the liquor dealers would be held in the treasury of the defendant until the expiration of six months. If it then appeared that the liquor dealer had not made purchases from 'any other source than from the defendant, there would be refunded to him two cents per proof gallon of the money remaining in the hands of the defendant. The liquor dealer, in turn, selling to his customers, would issue to them vouchers, and at the expiration of six months each customer could present this voucher to the distilling company, and, if accompanied by proof that the customer, whether he be a wholesale or retail dealer, had not purchased any goods except from the so-called agents of the distilling company, such customer would be entitled to receive five cents per proof gallon from the distilling company. The scheme is a very ingenious one, and was gotten up for the purpose of compelling the liquor trade to buy all its product from the Distilling & Cattle-Feeding Company.

One of the questions presented on the trial of the case was whether the method was legal. The argument was made that it was a simple rebate, such as railroads and other corporations had been in the habit of taking, and such as had been sanctioned by the courts. I do not regard it as a simple rebate. If the defendant had sold its product to the trade at the market price of such product through the country, and had then agreed with one of its consumers to discount or rebate from that market price a certain percentage on account of continued patronage, or for any other reason, such would be distinctly a rebate; but the defendant in this case exacted seven cents above the market price, and only agreed to return this amount thus exacted by it beyond the market price of the product on condition that the customer continue to buy all of his product from the defendant. It is not so much a rebate as a hostage that the customer will not go into any other market to purchase the product. Whether that is a restraint on trade which the law, in deference to public policy, will permit, it is not necessary, in this case, to pass upon. I have very great doubt, however, if the case were dependent on that question, whether I could find that such were a legal method of transacting business. It seems to be devised on the lines of a general agency, the distilling company being the principal, and all its customers being its agents, carrying its scheme along those lines with great plausibility, but escaping from all the obligations or relations which agency imposes upon parties; and in the end its practical effect is simply the taking of a hostage from the customer that he will buy from the defendant only, and to that extent is restraint on trade. But it is not necessary, in this case, to pass on that question.

The plaintiff in this case purchased a great quantity of goods from the defendant, and received back a certain amount of so-called rebates, until a time when the defendant refused to return any further rebates. The excuse of the defendant is, first, that the plaintiff purchased a car load of spirits from some other party than this defendant. The evidence does not disclose that such a purchase was made purposely. It was accidental on the part of one of the agents of the plaintiff, and the plaintiff itself had no knowledge of it. It was not done with any intention to deceive the defendant, or to break or in any way trench upon the understanding between them. I do not think it furnishes the ground for a forfeiture of the plaintiff's money the defendant had in his hands at that time.

The other breach alleged is that the plaintiff refused to deliver to the defendant a collector's form, known as "Form 52," whereby the defendant might be enabled to ascertain if the plaintiff had sold more to the retail trade than they had reported to the defendant. The object of that requirement, in the arrangement between them, was to enable the defendant to always check up the sales of the plaintiff, and in that way ascertain whether the plaintiff was buying any goods in any other quarter than from the defendant. The proof shows that the plaintiff offered an abstract of this form, —all the data that was necessary to enable the defendant to ascertain if the plaintiff had sold any goods other than those purchased from the defendant,—but the defendant insisted upon looking at the form itself. The form disclosed, not only the amount of goods sold by the plaintiff, which was the sole object of the requirement, but the names of the customers of the plaintiff, the places they were located, and the amount of goods that each had purchased. The form would have put into the hands of the defendant every business detail of the plaintiff's business, and thus enabled the defendant, in case it broke off relations with the plaintiff,—a thing which it could do under the arrangement at any time, and a thing that was even then the talk between the parties,—to go into the field of the plaintiff, knowing exactly all the details necessary to invade the plaintiff's territory. I do not think that the spirit of the agreement between the parties contemplated that the defendant should have any such advantage,—any such power over the plaintiff's business. It seems unfair and intolerable, as long as the plaintiff was ready to furnish to the defendant all the details that were necessary to enable the defendant to check up the plaintiff's sales. So long as that was complied with upon the part of the plaintiff, any further demand was, in my judgment, beyond the spirit, and therefore not in violation, of the agreement between the parties.

These being the only two reasons upon which the defendant refused to deliver up to the plaintiff the amount of money in its hands,—that money being clearly the money of the plaintiff, subject only to be forfeited in case the plaintiff should buy goods from any other source,—the plaintiff is entitled to recover back that money, and the finding of facts will be that the plaintiff in this case is entitled to recover of the defendant. Judgment accordingly.